R. Lynn MOORE, Plaintiff-Appellee,

v.

Aaron L. BAILEY, Defendant-Appellant.

No. 81–26–II.

Court of Appeals of Tennessee,
Middle Section at Nashville.

Sept. 18, 1981.

Permission to Appeal Denied by
Supreme Court Nov. 30, 1981.

Donald J. Ray, Tullahoma, for defendant-appellant.

Clinton H. Swafford, Winchester, for plaintiff-appellee.

## OPINION

CONNER, Judge.

Two issues presented by this appeal in this defamation action are whether there was material evidence to support the jury's finding of actual malice and its award of compensatory and punitive damages. Also raised is whether statements made to those who are investigating purported misconduct by a public official are part of a quasi-judicial function to such an extent that they are absolutely privileged.

The plaintiff-appellee, R. Lynn Moore,[1] the Franklin County environmentalist for the Tennessee Department of Public Health, instituted a suit for slander on February 1, 1980. The proof showed that the defendant, Aaron L. Bailey, had been making derogatory statements about the plaintiff for more than ten years. Plaintiff pleaded and testified that Bailey had "expressed malice and hatred toward him on many occasions" during that period and that defendant has stated on numerous occasions "that he would get the plaintiff in any way he could."

The actual utterances in issue here began on August 3, 1979, when the defendant contacted the state inspector general alleging criminal and civil misconduct on the part of the plaintiff. The defendant accused the plaintiff of misappropriation of state and county funds; of using state and county vehicles, property and employees for personal business; and of various instances of criminal conduct, e.g., taking kick-backs and dealing in illegal drugs. As a result of the defendant's first contact, there was an investigation conducted by Richard Reed, II, of the state department of public health. At that meeting the defendant related to Mr. Reed the information concerning all of the alleged improprieties.

The most crucial of the alleged defamatory statements were made to Dan Pickle, Moore's supervisor, on January 3, 1980. The remarks fall into eight categories: (1) Bailey stated that he had personally seen the county rabies control truck (operated under the supervision of the plaintiff) come to plaintiff's house on several occasions. Behind the truck was a trailer containing a lawn mower. The truck was driven by a county employee who, upon arrival, would mow his yard. (2) The defendant stated that he had been informed that Moore bought a 30.06 rifle purportedly for use in the rabies control program, but in reality for personal use in hunting deer. (3) The defendant stated that Mrs. Lon A. Tucker, a former employee, reported to him that she had seen a large number of doves in the freezer at the dog pound, which is also operated under the supervision of the plaintiff. (4) Bailey reported that Mrs. Tucker had also shown him some check stubs of her husband's. She purportedly alleged that these stubs indicated that her husband was paid for six or seven months as a rabies control officer when he actually did not work. The defendant further stated Mrs. Tucker had said that on one occasion her husband had shown a check to Moore who advised him to go ahead and cash it and say nothing. (5) The defendant reported that he had reliable information that marijuana

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbrevi- ated.

was being sold at the dog pound. He further said that his nephew, who worked for the sheriff, had knowledge that Moore did use and had sold marijuana. (6) Bailey stated that Moore applied double standards in the performance of his duties with the health department, that he was unfit to work for the government and should be fired. (7) The defendant stated that he had been told that the county rabies control truck had been used to haul everything imaginable, including hay, hogs and the like. (8) He stated that Moore served on the county board of sanitation and that the board had entered into many illegal contracts concerning collection and disposal of solid waste.

Plaintiff vehemently denied the truth of any of these charges, averring in his complaint that "all of the allegations of misconduct and criminal conduct made by the defendant were false and untrue." Plaintiff further alleged that the allegations against him constituted slander per se and "that the allegations were made by the defendant for the express, malicious purpose of doing him as much damage as he could."

The case was tried twice with the first trial resulting in a deadlocked jury. After the trial judge denied Bailey's motion to dismiss at the conclusion of Moore's proof on the basis of "no proof of actual malice, special damages, and that privilege was a defense," the second trial jury found the defendant guilty of slander. It fixed compensatory damages at $1,000.00 and punitive damages at $5,000.00. The defendant appealed.

■ Our review is pursuant to T.R.A.P. 13(d).[2] We must not weigh the evidence to determine the preponderance thereof, nor weigh the credibility of witnesses. Rather, our review is limited to a determination of whether there is *any* material evidence to support the verdict. In so doing, we must take the strongest legitimate view of all of the evidence to uphold the verdict, assume the truth of all that tends to support it and discard all to the contrary. We are bound

to allow all reasonable inferences to sustain the verdict, and if there is indeed any material evidence to support it, we must affirm. *See also Truan v. Smith*, 578 S.W.2d 73 (Tenn.1979); *Poe v. Atlantic Coast Line Railroad Co.*, 205 Tenn. 276, 326 S.W.2d 461 (Tenn.1959).

First, the defendant claims that there is no proof in the record of actual malice, the only evidence presented being of "common-law malice" and thus, improper.

■ Since the plaintiff is a public official, *see Press, Inc. v. Verran*, 569 S.W.2d 435 (Tenn.1978), the plaintiff must show that the defendant acted with actual malice. The definition of actual malice was succinctly stated by the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964).

> The constitutional guarantees require, we think, a federal rule that prohibits a *public official* from recovering damages for a defamatory falsehood relating to his *official conduct* unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not. (Emphasis in original.)

*Accord, see Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 415 (Tenn.1978). *Cf.* RESTATEMENT (SECOND) OF TORTS, § 580A (1977).

More specifically, the defendant asserts that proof of "common law malice," or past history of defendant's wrongful actions toward plaintiff, is irrelevant, inadmissible, and prejudicial in a slander case. He cites *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), and *Rosenbloom v. Metromedia*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), for the principle that ill will or bad motives are not elements of the *New York Times, supra,* standard and concludes that common law malice no longer has a place in modern slander cases.

■ However, to prove actual malice, there must be sufficient evidence to permit

---

**2.** (d) Findings of Fact in Civil Actions.

... Findings of fact by a jury in civil actions shall be set aside only if there is *no* material

evidence to support the verdict. (Emphasis supplied.)

the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication, and that publishing, with such doubt, shows reckless disregard for truth or falsity and demonstrates actual malice. *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

■ We conclude that the evidence of the past history of bad blood between the parties and the defendant's history of ill will and hostile feelings toward plaintiff for many years is competent, relevant and material. We hold such evidence admissible on the question of whether the alleged slanderous remarks sued upon were either known by defendant to be false or made with reckless disregard for the truth. We further hold that there is proof in the record from which a jury could properly conclude that the defendant acted with actual malice or reckless disregard for the truth in making the statements described herein about the plaintiff.

In his testimony regarding his investigation, Dan Pickle revealed that the defendant had actual doubts about the truth of his previous statements about the plaintiff.

Q. (by Mr. Swafford) After this discussion that he had with you, did he ask you any questions about what you thought would be the results of these allegations?
A. (by Mr. Pickle) Yes. *He wondered if these allegations were found to be true.* He wanted to know if Lynn Moore would be fired. In fact, he stated that he believed that *if these allegations were found to be true*, that Lynn Moore ought to serve some time for these things. (Emphasis supplied.)

From these statements and others, especially relating to the length and breadth of Bailey's contempt for Moore, the jury could certainly find that Bailey entertained "serious doubts" as to the truth of what he was saying about Moore. Despite the fact that the defendant "wondered" if the allegations were true, he accumulated every bit of information obtainable that seemed to be derogatory about the plaintiff and persisted in repeating it to almost anyone who would listen. If defendant's view of the admissibility of evidence of previous defamatory statements and hostile activities toward plaintiff was held to be the law in this state, few, if any plaintiffs who are public figures, would ever be able to meet the already severe burden of proving "actual malice" in order to recover. We are unable to visualize how any plaintiff would more logically attempt to meet this burden than in the manner and fashion undertaken by Moore herein—that is, by laying before the jury a history of Bailey's unjustified hostility toward Moore, then proving the falsity of the specific statements sued upon as slanderous.

■ Additionally, the defendant contends that there is no material evidence to support the recovery of compensatory or punitive damages. Again, if there is any material evidence to support the award of damages, we must affirm the judgment. T.R. A.P. 13(d), *supra*. Every reasonable inference must be indulged in favor of the plaintiff. *Houser v. Persinger*, 57 Tenn.App. 401, 405, 419 S.W.2d 179, 181 (1967).

The actual damage requirement was set forth by the Supreme Court in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349–350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789, 811 (1974).

It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define "actual injury," as trial courts have wide experience in framing appropriate jury instructions in tort actions. *Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.* Of course, juries must be limited by appropriate instructions, and all awards must be supported by competent evidence concerning the injury, although there need be no evidence which assigns an actual dollar value to the injury. (Emphasis supplied.)

*See also Handley v. May*, 588 S.W.2d 772, 776 (Tenn.App.1979).

The plaintiff put on proof from which the jury could find some minimal out-of-pocket loss in that he lost time from work and vacation time, incurred expenses in traveling to Nashville to respond to the charges made by the defendant. From his own testimony in this regard the jury could likewise determine that Moore suffered personal humiliation and mental anguish as a result of the defendant's actions. For example

Q. (by Mr. Swafford) As you would hear feedback from these derogatory things that we've named here and he's admitted, tell the Court and Jury, at least, some of your reactions how it affects you.

A. (by Mr. Moore) Well, it seems that I can't get away from it. Everywhere that I go, some of my friends always kidding me about it, and it's not much of a kidding matter anymore to me.

I know I went—one of the reasons I got out of the Army Guard was I was down in southern Georgia and I thought I was away from everything. And a guy that worked for Aaron Bailey came to me and started a bunch of stuff so I had to exit that conversation.

But everywhere I go—restaurant this morning, somebody called me by that name and it's just—gets to me.

Q. Now—

A. I can't get away from it. It's in my mind and disturbs me—my mind, really, my family.

Q. Has the fact that these things been said over and over by Mr. Bailey had any effect on your inter-relationship with other members of your family?

A. Certainly has.

Q. Describe that as best you can.

A. Well, like I said previously, I don't seem to be able to get it off my mind. When I get home, it bothers the wife in that something might have occurred that day that I'll be thinking about it and it'll be related to Aaron Bailey. And she'll be talking about something and I'll not be hearing a thing of it, and she gets irritated at that, of course. And this is just one example.

It's not just a few. Less than a month ago, I was out at Ray Judge's, and they—Ray Judge and some other guys brought up the subject and what about it, you know, and thought it was funny. But it's not funny to me, and I left.

Q. Has the same thing affected your performance of your your duties, your professional responsibility?

A. I think it has in that it bears so much on my mind all the time. When I'm out working, I strive to do a good job. But this one thing is that this person is just after me, and he spends so much time, dedication to find out why Lynn Moore is such a sorry person. It certainly bothers me in a lot of ways.

There is ample competent, relevant and material evidence to support the very modest awards by the jury in this case of actual and punitive damages under the standard of *Gertz v. Robert Welch, Inc., supra.*

The defendant also asserts that all of his actionable statements were made to people who had the authority to investigate the charges or to people who were investigating them. Therefore, the defendant claims that the statements were published pursuant to a quasi-judicial function and are privileged.

It is clear that relevant statements made in the course of judicial proceedings are absolutely privileged and cannot form the basis of a defamation action. *Lambdin Funeral Service, Inc. v. Griffith*, 559 S.W.2d 791, 792 (Tenn.1978).

Thus, the question becomes whether statements made preliminary to a judicial proceeding are also privileged. The defendant cites a leading treatise, W. PROSSER, HANDBOOK OF THE LAW OF TORTS, § 114 (4th ed. 1971), and two cases from other jurisdictions, *Cushman v. Edgar*, 44 Or.App. 297, 605 P.2d 1210 (1979), and *McGranahan v. Dahar*, 119 N.H. 758, 408 A.2d 121 (1979), as the authority for this proposition.

However, we believe this case is governed by *Spain v. Connolly*, 606 S.W.2d 540 (Tenn. App.1980). There, the defendant accused the plaintiff police officer of soliciting a bribe when he issued a traffic ticket. The defendant had tried to instigate an investigation of the plaintiff through the internal affairs office of the police department. The only people with whom he was alleged to have communicated the defamatory statement included the sergeant, the lieutenant, the captain, and the security officers of the police department. The court found that there was clearly no basis for the claim of privilege as to the admissibility of evidence. The court quoted the rule regarding judicial immunity from *Lambdin, supra*, and then held:

> There is no evidence in this record that any of the police officers to whom defendant made the alleged defamatory statement constituted a tribunal as described by the Supreme Court.

> The proceedings in which appellant made his statements were *preliminary and investigatory only*. If the statements were made *in a hearing* before a Chief of Police who had authority to discipline the officer, or before a Civil Service Commission with power to review discipline imposed by the Chief, then the claim of privilege, or, more properly immunity, would be more appropriate. Immunity does not protect the statements made in the present case. (Emphasis supplied.)

*Id.* at 543.

To hold the doctrine of privilege applicable to investigatory situations such as this—especially so very preliminary in nature—would be to give license to those with ill will and malice toward others to harass them unmercifully simply by addressing their vituperative comments to law enforcement or other governmental investigatory authorities. We are unwilling so to do. There was certainly no "tribunal" present here. Therefore, Bailey's statements were not privileged and were actionable.

Accordingly, the jury verdict is affirmed and this cause is remanded to the trial court. The costs are taxed to the defendant.

AFFIRMED AND REMANDED.

TODD, P. J. (M.S.), and LEWIS, J., concur.